# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1555

_____

Armando Rodela-Aguilar,                          *
                                                 *
    Petitioner - Appellee,                       *
                                                 *
                                                 *     Appeal from the United States
    v.                                           *     District Court for the
                                                 *     Western District of Missouri.
United States of America,                        *
                                                 *
    Respondent - Appellant.                      *

_____

Submitted: December 16, 2009
Filed: March 4, 2010 (corrected 3/05/10)

_____

Before LOKEN, Chief Judge, ARNOLD and BENTON, Circuit Judges.

_____

LOKEN, Chief Judge.

After two conspirators pleaded guilty, a jury convicted Armando Rodela-Aguilar (Rodela), Joel Castro-Gaxiola (Castro), and Reyes Martinez-Ruiz (Martinez) of conspiring to distribute, and aiding/abetting possession with intent to distribute, methamphetamine. We affirmed, rejecting claims of insufficient evidence. United States v. Castro-Gaxiola, 479 F.3d 579 (8th Cir.), cert. denied, 552 U.S. 971 (2007). Rodela then filed this 28 U.S.C. § 2255 motion for post-conviction relief, alleging trial counsel provided constitutionally ineffective assistance. After a hearing, the district court granted the motion on three grounds, one related to sentencing, and ordered a new trial or, alternatively, resentencing. The government appeals, conceding sentencing error but arguing that counsel did not provide Rodela ineffective assistance

at trial. We agree. Therefore, we reverse the grant of a new trial and remand for resentencing.

## I. The Trial

In mid-February 2005, a reliable confidential informant told Kansas City police that Arturo Navarrete-Silva (Navarrete) took the informant and her boyfriend to the basement of a residence on Fremont street, removed a "bazooka case" from under a bed, and showed them three pounds of methamphetamine inside. Police obtained a warrant to search the Fremont residence. In late February, Castro, Martinez, and Castro's girlfriend, Angela Fennel, left San Diego for Kansas City in a car bearing a temporary Missouri license tag that had been mailed to Castro in an Express Mail envelope. The mailing label identified Rodela as the sender and listed his prior Kansas City residence as the return address.

In the early evening of March 1, the informant called police from the Fremont residence to report that she heard men talking in Spanish in the basement and then Navarrete delivered a half pound of methamphetamine to her boyfriend. Police immediately established surveillance and alerted a tactical team to execute the warrant. Navarrete, Castro, Martinez, and Navarrete's brother left in two vehicles and were arrested. Police seized a cell phone from Navarrete that listed Rodela's e-mail address as the provider's contact.

As police approached the Fremont residence to execute the warrant, Rodela parked in the driveway, went to the front door with a key, and was arrested before he could enter. In executing the warrant, police found 307 grams of methamphetamine in a large PVC pipe under Rodela's bed in the basement bedroom; 334 grams and a shotgun in a closet near Rodela's bed; and shotgun shells, a heat sealer, two digital scales, and a monthly bill for two telephone lines addressed to Rodela elsewhere in the bedroom. They found other evidence of drug trafficking in another area of the

basement, in the kitchen, and in an upstairs bedroom. Navarrete and Rodela were later released. On March 8, responding to a tip from the informant that Navarrete was about to leave Kansas City from another location, police went there and found Rodela with Navarrete. After arresting Rodela as an illegal alien, police found a dollar bill folded around a small quantity of cocaine in his pocket.

Fennel and Navarrete pleaded guilty. At trial, Fennel testified for the government that she saw Martinez cutting or packaging a large quantity of methamphetamine before packing the car in San Diego for their trip to Kansas City. The trio arrived at the Fremont residence at about 2:00 a.m. on March 1. Rodela answered the door and let them in but did not take part in the subsequent conversation between Navarrete, Castro, and Martinez. Fennel and Castro went to a motel a short time later. Fennel stayed in the motel when Castro left the next morning.

The government's remaining witnesses were law enforcement officers who conducted the investigation, surveillance, arrests, questioning, and searches, and Postal Inspector Richard Britain. Britain explained how the Postal Service tracking system for Express Mail packages enabled him to find the mailing label that was filled out at a Kansas City post office showing Rodela as the sender, a return address, and Castro as the addressee. The delivery copy of the label showed that Castro signed for the package in San Diego. The three defendants presented no evidence. The jury found them guilty of all charges.

## II. The § 2255 Hearing

After we affirmed his conviction, Rodela filed a *pro se* motion for relief under 28 U.S.C. § 2255 alleging ineffective assistance of counsel. As clarified in a later *pro se* pleading, Rodela claimed that trial counsel Lisa Nouri failed to prepare a proper defense because she did not contact co-defendant Navarrete (who pleaded guilty one week before trial but did not testify) and Rodela's employers, who would have

testified that Rodela was at work the afternoon of March 1 and thus could not have participated in unloading the methamphetamine to the basement bedroom and then distributing one-half pound as reported by the informant. Rodela accompanied this pleading with an affidavit purportedly signed by Navarrete (now in prison) describing the conspiracy offense in great detail, declaring that he would have testified that Rodela was unaware of these activities and "is totally innocent of the charges," and stating that he wrote Rodela's name on the Express Mail label without Rodela's knowledge. Based on this additional evidence, Rodela concluded:

> If counsel had spoken with [employer] Peter Medina and realized the only remaining shred of evidence remaining [was the Express Mail] tag itself, a simple handwriting analysis would have negated its value.

Rodela further argued that counsel was ineffective at sentencing in not urging a minor role reduction. The district court appointed counsel and ordered a hearing to consider three issues: failure to investigate and call Navarrete; failure to investigate and call Medina; and failure to urge a minor role adjustment at sentencing.

At the hearing, two employer witnesses first testified that Rodela worked regularly as a musician at their Mexican restaurants. One, Peter Medina, testified that, if called at trial, he would have testified that Rodela arrived at his restaurant between 3:30 and 4:00 p.m. on March 1 and did not leave until 9:00 or 9:30 p.m., the period during which the informant reported drug distribution at the Fremont residence. Rodela next called trial counsel Nouri, who explained why she did not call these employers as witnesses: a detective testified that Rodela was a musician who played at these restaurants; absence from the Fremont residence on March 1 would not establish Rodela's non-involvement in the conspiracy; and:

> I was concerned if those people came in, that they would be cross-examined about the fact that [Rodela was] an illegal alien, he was getting paid cash under the table, one of his tips included a rolled up dollar bill

with cocaine in it [and] their establishments are known businesses where Mexican drug dealers negotiate and do deals . . . . I just decided it was probably best not to have those two owners come in and open that whole can of worms to cross-examination.

Ms. Nouri further testified that she contacted Navarrete's attorney twice about whether Navarrete would testify favorably to Rodela. Both times, the attorney said that, if called, Navarrete would invoke his Fifth Amendment right not to testify. In the second conversation, at the time Navarrete pleaded guilty, counsel added that, if Navarrete testified, it would not help Rodela. Ms. Nouri testified that she "reviewed all of the discovery" in Rodela's case but never had the Express Mail label examined by a handwriting or fingerprint expert. She explained that she did not urge a minor role adjustment at sentencing because it would have been inconsistent with Rodela's denial of participation in the conspiracy.

The hearing then took a dramatic turn when Navarrete, subpoenaed to testify, refused to answer all questions, including whether he had signed the affidavit filed by Rodela. After a recess during which Navarrete conferred with his trial counsel, Navarrete invoked his Fifth Amendment privilege. After declining to compel him to answer, the court accepted the affidavit into the hearing record but later ruled it "has no evidentiary value." Rodela then testified that he was innocent, that he told Ms. Nouri he wanted his employers and Navarrete to testify at trial, and that he was at work the afternoon of March 1. He was not questioned about the Express Mail label. The hearing concluded with testimony by Navarrete's trial counsel, called as a government witness. He testified that, when Ms. Nouri inquired whether Navarrete would testify at Rodela's trial, he told her he would advise Navarrete to "take the Fifth" if called to testify.

# III. The District Court's Ruling

Properly applying the standards of <u>Strickland v. Washington</u>, 466 U.S. 668, 690, 694 (1984), the district court's Order and Opinion explained that, to prevail on a claim of ineffective-assistance, Rodela must show both deficient performance -- acts or omissions "outside the wide range of professionally competent assistance" -- and prejudice -- "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The court granted § 2255 relief, concluding that attorney Ms. Nouri's assistance was ineffective for three reasons.

The first reason was an issue noted in Rodela's pleading but not noted in the court's order granting an evidentiary hearing -- that Ms. Nouri "did not act in an objectively competent manner in failing to analyze the handwriting on the mailing label . . . the most important piece of evidence presented to the jury tying Rodela to the conspiracy." Turning to the issue of <u>Strickland</u> prejudice, the court stated:

> After reviewing Rodela's handwriting on the <u>Miranda</u> waiver form and the pleadings he has signed in this action, the Court finds that the handwriting on the mailing label does not match Rodela's, but rather, matches Navarrete's. Even without expert testimony, a comparison could have been made by the jury, <u>see</u> Fed. R. Evid. 901(b)(3), and the jury would probably have drawn the same conclusion as the Court if Rodela's attorney had presented the handwriting of Rodela and Navarrete for comparison to the label.

Second, the court concluded that Ms. Nouri was ineffective for failing to call employer Medina as a witness. "While the Court agrees that Rodela could have been a member of the conspiracy even if he was not present while some conspiratorial activities were taking place, the Court concludes that Mr. Medina's testimony, combined with the jury's likely conclusion that Rodela was not the person that mailed the temporary car tag to California, would have changed the jury's verdict to not

guilty." The court rejected the claim that Ms. Nouri's performance was deficient for failing to interview Navarrete and subpoena him for trial, nor could prejudice be shown because Navarrete refused to testify at the § 2255 hearing.

Third, the court concluded, in a ruling the government does not challenge on appeal, that Ms. Nouri's failure to pursue a minor role reduction at sentencing fell "outside the wide range of competent assistance," because Rodela's conduct, unlike the other conspirators, "did not include transporting, handling, and distributing the drugs." The court explained that, if urged, it would have applied a three-level reduction and likely sentenced Rodela to the bottom of the revised advisory range "and certainly to less than the 151 months Rodela received."

## IV. Discussion

On appeal, the government argues the district court erred in concluding that attorney Nouri's performance was deficient in handling the Express Mail label issue and in failing to call employer Medina as a defense witness, and that Rodela failed to show <u>Strickland</u> prejudice with regard to either issue. We review ineffective-assistance issues *de novo* and the district court's findings of predicate facts for clear error. <u>See</u> <u>United States v. White</u>, 341 F.3d 673, 677 (8th Cir. 2003), <u>cert. denied</u>, 541 U.S. 955 (2004). "When assessing attorney performance, courts should avoid the distorting effects of hindsight and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time." <u>United States v. Staples</u>, 410 F.3d 484, 488 (8th Cir. 2005) (quotation omitted). A court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.

**A. The Express Mail Label Issue.** At trial, Postal Inspector Britain testified on direct examination that the Express Mail label "is usually but not always prepared by the subject who is mailing it." Ms. Nouri followed up during cross exam:

Q: Now, you said that the section that described the person sending the mail may or may not be the actual person, in fact?

A: That's correct.

Q: There's no identification required for that?

A: That's correct.

Q: So I could walk into the post office right now, fill out an Express Mail thing from Rich Britain to anybody in California and use a local address here and that would get sent?

A: That's correct.

During her cross-examination of Detective Brian Wilson, Ms. Nouri highlighted Rodela's handwriting to the jury, clarifying that, on a <u>Miranda</u> waiver form, Rodela's signature was in the middle of the page whereas the listing of his name on the top of the form was "not his handwriting." Then, during closing argument, Ms. Nouri sought to minimize the significance of the mailing label:

> Anybody can go in and put anybody's name on [the mailing label]. I could take any one of your names . . . go on a break to the downtown post office [and] mail something to Timbuktu with your name as sender. That doesn't make it so. . . . There is a <u>Miranda</u> Waiver that Mr. Rodela signed . . . . And you can see how he does a lot of those capital letters. Especially he likes that capital A on the end. He likes the capital N and R. . . . The postal receipt didn't [prove] Mr. Rodela was the sender.

The district court concluded that Ms. Nouri's performance was deficient "in failing to analyze the handwriting on the mailing label." As the above-quoted passages make clear, Ms. Nouri clearly did "analyze the handwriting" by comparing the label to Rodela's signature and arguing to the jury the two did not match. Of course, an additional way to analyze handwriting is to consult a handwriting expert.

But the court did not base its deficient performance conclusion on that, nor would § 2255 relief be warranted on that basis. A claim of ineffective assistance based on the failure to consult and call an expert requires "evidence of what a scientific expert would have stated" at trial in order to establish <u>Strickland</u> prejudice. <u>Day v. Quarterman</u>, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted); <u>accord</u> <u>Delgado v. United States</u>, 162 F.3d 981, 983 (8th Cir. 1998). That is a fatal omission here. Postal Inspector Britain testified that the sender does not always fill out the Express Mail form. For example, a postal clerk might complete the English language form for a sender, like Rodela, who is not fluent in English. Without specific testimony by a handwriting expert at the § 2255 hearing, it was not possible to establish <u>Strickland</u> prejudice based upon failure to call an expert. <u>Compare</u> <u>United States v. Arnulfo-Sanchez</u>, 219 Fed. App'x 796, 798 (10th Cir. 2007) (no evidence presented that handwriting expert would have affected trial outcome) (unpublished).

The district court based its conclusion of deficient performance and <u>Strickland</u> prejudice on its finding that the Express Mail label was in Navarrete's handwriting, not Rodela's, and that Ms. Nouri should have put a sample of Navarrete's handwriting in the record and urged the jury to make the same finding.[1] This is a plausible tactic Rodela's defense counsel might have pursued, but on this record it is too speculative to warrant § 2255 relief. On the issue of deficient performance, Ms. Nouri was not asked at the hearing many questions crucial to establish that her conduct fell outside "the wide range of reasonable professional assistance" in failing to present this theory:

---

[1] We agree with the district court that the jury could have compared the handwriting on the Express Mail label with examples of Rodela's and Navarrete's handwriting without the assistance of a handwriting expert witness. <u>See</u> <u>United States v. Tarricone</u>, 21 F.3d 474, 476 (2d. Cir. 1993); <u>Greater Kansas City Laborers Pension Fund v. Thummel</u>, 738 F.2d 926, 928 (8th Cir. 1984).

- Did Rodela tell her he did not fill out the label and Express Mail the temporary vehicle tag to Castro? If not, did she have any other reason to suspect he had not done so?

- Did she have any basis to suspect Navarrete instead completed the label?

- The Order and Opinion stated that the district court compared the mailing label with Navarrete's signature on his plea agreement, a document not in the record on appeal. Did she compare the signature on Navarrete's plea agreement with the label? Did she check whether there were other documents in the discovery record containing Navarrete's signature? If so, did she find, as the court did, that all Navarrete signatures clearly matched the label?

- If Navarrete's plea agreement was the only sample available, would getting his signature admitted into evidence with this document have compromised her defense strategy, or triggered objections by defense counsel for Castro or Martinez?

- And most important of all, why did she not pursue this tactic?

Regarding the last question, it is not difficult to posit why Ms. Nouri might reasonably decide not to urge the jury to find that Navarrete filled out the mailing label, using Rodela's name and a return address where they had lived a few months earlier. The government's case hinged on linking Rodela to Navarrete, the primary conspirator in Kansas City. The evidence linking Rodela to Navarrete's conspiracy was: (i) they lived together; (ii) the mailing label; (iii) methamphetamine and digital scales were found in Rodela's basement bedroom, consistent with the informant's description of two visits to the Fremont residence; (iv) Navarrete was arrested with Rodela's cell phone, and recent calls on that phone were linked to apparent drug transactions recorded in a notebook seized from Navarrete; and (v) Rodela was with Navarrete when they were arrested on March 8 after the informant told police Navarrete was about to leave Kansas City. Defending this case, a competent attorney could reasonably conclude that persuading the jury Navarrete mailed the temporary tag to Castro using Rodela's name and a prior common address would play into the

government's attempt to link her client to Navarrete. Compare Sanders v. Trickey, 875 F.2d 205, 208 (8th Cir.), cert. denied, 493 U.S. 898 (1989) (valid trial strategy to avoid suggesting a connection with a potential witness that would be damaging). Thus, the tactic Ms. Nouri in fact pursued -- simply raising doubt whether Rodela filled out the mailing label -- was more consistent with her overall defense strategy.

We also conclude that Rodela failed to prove Strickland prejudice on this issue. Without question, the prosecutor stressed the mailing label in closing argument. But if the trial record had included evidence strongly suggesting that Navarrete filled out the label, would the government's case against Rodela have been significantly weaker? The label still would provide another, albeit different link between Navarrete and Rodela. And the other evidence linking the two remained -- the drugs and scales in Rodela's bedroom, his cell phone in Navarrete's possession containing evidence of calls to drug customers, and Rodela apparently helping Navarrete flee a week after their March 1 arrest when Rodela, if in fact innocent, should have been doing everything possible to distance himself from Navarrete. Strickland prejudice is a rigorous standard. On this barren record, we conclude there is not a reasonable probability the result of the proceeding would have been different had the jury been persuaded that Navarrete filled out the Express Mail label. Compare United States v. Robinson, 301 F.3d 923, 925 (8th Cir. 2002), cert. denied, 537 U.S. 1238 (2003).

**B. Failure to Call Medina.** The district court further concluded that Ms. Nouri was ineffective in failing to call employer Medina as a defense witness because his testimony "would have further removed [Rodela] from the conspiracy, particularly after the link between Rodela and the temporary tag was properly attacked." Though the district court properly considered the combined prejudicial impact of the two issues, we disagree with its conclusion that Rodela established deficient performance by Ms. Nouri in not calling Medina.

Strickland teaches that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. We have consistently held that a reasoned decision not to call a witness "is a virtually unchallengeable decision of trial strategy," in part because "there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences." Staples, 410 F.3d at 488-89, and cases cited.

In this case, Ms. Nouri testified that she employed precisely this sort of cost-benefit analysis. She concluded that the potential benefits of calling Medina were slight because a government witness established that Rodela worked as a musician, the government did not contend that Rodela was at the Fremont residence when significant drug activity occurred the afternoon of March 1, and proving his absence at that time would not establish that he was not a conspirator. On the other hand, Ms. Nouri saw significant risk that calling the restaurant owners would open up issues of frequent drug dealing at their restaurants, including Rodela receiving cocaine rolled up in dollar bills as tips.

The trial record establishes that these were not imaginary concerns. During the government's case-in-chief, the prosecutor elicited testimony that Rodela was a musician who played at a particular Mexican restaurant and asked the witness to describe his investigative activity in or near that restaurant. When defense counsel objected, the prosecutor stated in a side-bar conference he had evidence that would create a "perception that you could not frequent that location and not know that narcotics were being sold." The trial court sustained the objection, but the risk of opening up that line of inquiry of course remained. The prosecutor later presented testimony by another officer that Rodela had a dollar bill folded around a small amount of cocaine in his pocket when arrested with Navarrete on March 8. Defense counsel succeeded in limiting that to Rule 404(b) evidence, but again it was a subject to avoid potentially opening up through defense witnesses.

-12-

Whether as a matter of hindsight we agree with attorney Nouri's cost-benefit analysis of whether to call employer Medina is not the test in applying the deferential presumption mandated by Strickland.  See, e.g. Wing v. Sargent, 940 F.2d 1189, 1191-92 (8th Cir. 1991).  Nor did Rodela establish that the decision not to call Medina resulted in Strickland prejudice, whether viewed in isolation or along with the mailing label issue we have previously discussed.

For these reasons, we conclude that attorney Nouri's performance at trial was neither constitutionally deficient nor prejudicial to Rodela.  Therefore, we vacate the district court's grant of a new trial.  As the government does not challenge the district court's conclusion that Ms. Nouri provided ineffective assistance at sentencing in failing to urge a minor role adjustment, we reverse the district court's Opinion and Order dated January 8, 2009, and remand for resentencing.

_____