# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-2206

_____

Robert Ford

*Movant - Appellant*

v.

United States of America

*Respondent - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: October 16, 2018
Filed: March 6, 2019

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

SMITH, Chief Judge.

On July 19, 2012, a jury found Robert Ford guilty of kidnapping but acquitted him on the charge of sexual abuse of an incapacitated person. The district court[1] then sentenced Ford to 36 months' imprisonment. Ford appealed that conviction, and we affirmed. *See United States v. Ford*, 726 F.3d 1028, 1029 (8th Cir. 2013). Ford then

_____

[1] The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

moved to vacate, set aside, or correct his sentence in the district court. *See* 28 U.S.C. § 2255. Ford claimed ineffective assistance of counsel based on his counsel's alleged failure to impeach his accuser's credibility. The district court denied Ford's motion without holding an evidentiary hearing.

Ford now appeals that denial, arguing that the district court erred in denying his § 2255 motion and declining to hold an evidentiary hearing. For the reasons stated below, we affirm.

## I. *Background*

In December 2011, Ford was charged with sexually assaulting and kidnapping Christina Weston. Weston claimed Ford assaulted her while she was sleeping and then confined her in her bedroom to prevent her from reporting the assault.

The court appointed Stacy Kooistra as Ford's counsel. Kooistra represented Ford through the end of his jury trial. In preparation for trial, Kooistra sought and secured a court-appointed investigator, Tim Mulloy, and two court-appointed medical experts. Kooistra also successfully subpoenaed phone records to assist in establishing a timeline for relevant events.

At trial, the government called Eric Sherman and Michelle Red Earth as witnesses. Sherman and Red Earth had been at Weston's house drinking with her and Ford the night before the alleged assault. Both also slept at Weston's house that night.

Sherman testified that he and Red Earth arose around 11 or 11:30 a.m. on the morning of the alleged assault. About 15 or 20 minutes after waking, Sherman heard noise coming from Weston's bedroom. He went to investigate, but Ford stepped out of the room just as Sherman approached and closed the door behind him. Ford told Sherman that Weston was "having a fit, an attack" and that he had "better go check on her." Trial Tr. at 41, *United States v. Ford*, No. 4:11-cr-40116-KES-1 (D.S.D.

October 25, 2012), ECF No. 87. Sherman described Ford as upset. When Sherman entered the room, he found Weston on the floor "sobbing," with red marks on her arms. *Id.* When asked what was wrong, Weston told Sherman "that f\*\*\*ing Bob" and pointed towards the door. *Id.* at 42.

Red Earth testified that she got up between 8 and 9 a.m. to go buy breakfast supplies and then returned to Weston's house. She testified to hearing a cry, "something . . . horrible. . . . like a shattered soul" coming from Weston's bedroom sometime after returning. *Id.* at 56. Red Earth then found Weston on her bedroom floor "in a heap, crying, trembling, broken." *Id.* at 56–57. Weston told Red Earth that Ford had done "wrong." *Id.* at 57. Red Earth testified Weston had marks on her arms and legs, which had not been present the night before.

Weston also testified. Weston explained that she and Ford had once dated, but they had stopped in 2008. Ford lost his home in the spring of 2011, and Weston allowed him to live in her basement while he searched for new accommodations; however, they did not rekindle their relationship during this time. Just as Sherman and Red Earth had, Weston described the evening preceding the assault as involving heavy alcohol consumption. At trial, she testified to awakening to pain in her genital area between 7 and 9 a.m. the next morning and to seeing Ford "scrambling to get [her] bottoms up and backing away." *Id.* at 79. Weston claimed that she started screaming and tried to leave the room, but Ford blocked her by standing in front of the door and putting his leg up. She claimed that he also took her cell phone when he left. She then testified she was unable to leave the room until Sherman arrived. Weston also identified photos of the marks on her arms and legs; she said they were bruises that Ford caused.

When Kooistra cross-examined Weston, he highlighted inconsistencies between her testimony and that of the other witnesses. Weston alleged the assault and confinement occurred sometime between 7 and 9 a.m. In contrast, Sherman's

-3-

testimony suggested a later time frame. Kooistra also highlighted inconsistencies in Weston's own testimony. Although Weston initially stated she saw no clock in her room, she later testified to seeing a clock. She also initially stated she awakened several times during the night preceding the alleged assault. But she later testified to being so incapacitated by alcohol and Ambien that she did not wake up when Ford had sex with her. Kooistra also exposed inconsistencies in her testimony about the amount of beer she consumed that night and the nature of Ford's sexual acts.

To conclude its case, the government called a forensic scientist, who testified to the presence of Ford's sperm in Weston's genital area, and a physician's assistant, who testified to the freshness of the bruising on Weston's arms and legs. Finally, the government called the FBI agent who had interviewed Weston and Ford following Weston's allegations. The agent testified to his conversations with the victim and suspect.

After the close of the government's case, Kooistra initiated Ford's defense by calling two expert witnesses: Drs. Eric Kutscher and Elizabeth Dimitrievich. Dr. Kutscher testified as an expert in pharmacology. His testimony cast doubt on Weston's claim that she had been incapacitated during her sexual encounter with Ford by the pills and alcohol consumed the evening prior; Dr. Kutscher concluded Weston would have become more sober by dawn. Dr. Dimitrievich testified as an expect in gynecology. Her testimony called into question Weston's description of Ford's sexual acts. Dr. Dimitrievich concluded the condition of Weston's genital area was inconsistent with the type of acts Weston claimed Ford had perpetrated.

Finally, Kooistra called Ford to testify on his own behalf. Ford averred that he and Weston had consensual sex around 10:30 a.m. of the morning in question. He testified that after their encounter, they chatted and eventually discussed his upcoming testimony against her in a tribal assault case; Ford had been scheduled to testify against Weston for assaulting him on a prior occasion. Ford had previously

obtained permission from the court to ask questions related to the assault charges against Weston. Ford claimed that, after they discussed his upcoming testimony that morning, Weston began screaming at him. Ford alleged that he called Weston's mother after Weston began asking for her. Ford denied confining Weston to her bedroom, bruising her, or taking her cell phone.

The jury returned a verdict of not guilty on the charge of sexual assault of an incapacitated person and a verdict of guilty on the charge of kidnapping. The district court then sentenced Ford to 36 months' imprisonment, a downward variance from the Guidelines range of 121 to 151 months. Ford appealed his sentence, arguing that he could not be convicted of kidnapping since he had been acquitted of sexual assault. He also contested the district court's jury instructions, as well as its denial of his motions for judgment of acquittal and for a new trial. We affirmed Ford's sentence. *Ford*, 726 F.3d at 1029.

In October 2015, Ford filed for relief under 18 U.S.C. § 2255. Ford claimed ineffective assistance of counsel based on Kooistra's alleged failure to impeach Weston's credibility. The district court denied Ford's motion without holding an evidentiary hearing. Ford now appeals that denial, arguing that the district court erred in denying his § 2255 motion and in declining to hold an evidentiary hearing.

II. *Discussion*
A. *Ineffective Assistance of Counsel*

On appeal, Ford's principal argument is that Kooistra rendered ineffective assistance of counsel at trial in violation of the Sixth Amendment. Ford argues the district court thus erred in denying his § 2255 motion to vacate, set aside, or correct his sentence. Ford specifically alleges Kooistra was ineffective in failing to thoroughly investigate Weston and in failing to effectively impeach her. Ford's argument fails.

We review the merits of Ford's ineffective-assistance claim de novo. *Adams v. United States*, 869 F.3d 633, 634 (8th Cir. 2017). We do so mindful of the Supreme Court's directive that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

For Ford to prevail on his ineffective-assistance claim, he must satisfy both prongs of the two-part test announced by the Supreme Court in *Strickland*. *Id*. at 687. First, Ford must show that, with respect to each instance of alleged ineffectiveness, Kooistra "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [Ford] by the Sixth Amendment." *Id.* Generally, counsel enjoys a "strong presumption that [his] conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation omitted).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id.* at 690–91.

Second, even if Ford satisfies *Strickland*'s first prong, counsel's errors would only warrant reversal if Ford could prove "that the deficient performance prejudiced the defense." *Id.* at 687. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

-6-

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Because the defendant must satisfy both prongs of the *Strickland* test to succeed on an ineffective-assistance claim, a court may decide such a claim by addressing either prong. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

In its order, the district court focused on the prejudice prong. The court held that Ford had not been prejudiced by Kooistra's alleged errors because the jury had sufficient objective evidence of guilt before it to convict Ford, irrespective of Weston's supposed character for dishonesty. For support, the court highlighted the considerable evidence of guilt—apart from Weston's testimony—offered at trial. The court noted the documented bruising on Weston's arms and legs. It noted Sherman's, Red Earth's, and the physician's assistant's testimony that Weston's bruising appeared fresh on the morning of the incident. It cited Sherman and Red Earth's testimony about a commotion in Weston's bedroom around the time of the alleged assault. And, it construed the record of a cell phone call by Ford to Weston's mother as supporting Weston's claim that Ford took her phone. We agree with the district court that the jury had sufficient objective evidence of guilt to convict Ford.

Ford reads the district court's opinion as "impliedly conclud[ing], for purposes of its analysis, that trial counsel was ineffective but no harm, no foul." Appellant's Br. at 10. In fact, the district court made no such finding. The magistrate judge's report and recommendation, which the district court adopted in full, described Kooistra's investigation as "well above the standard of performance required by the Sixth Amendment," and his impeachment of Weston as "not deficient." R. & R. at 32, 37, *Ford v. United States*, 4:15-cv-04152-KES (D.S.D. Aug. 18, 2016), ECF No. 28.

On this record, we conclude that Kooistra was not ineffective in his representation of Ford.

### 1. *Failure to Investigate*

Ford alleges Kooistra rendered ineffective assistance by failing to thoroughly investigate Weston. Ford claims Kooistra would have discovered additional evidence to impeach Weston's credibility had he performed a more thorough investigation. Specifically, Ford claims Kooistra would have identified as witnesses (1) Nathan Sunderland, an ex-boyfriend who had obtained a protection order against Weston; (2) Erika Dewald-Hoss, Weston's ex-husband's wife, who considered Weston dishonest; (3) Lee Hoss, Weston's ex-husband, who had allegedly been the subject of false allegations by Weston; and (4) Kent Bucher, an ex-boyfriend who also allegedly had knowledge of Weston's dishonest character. Ford argues Kooistra could have used these witnesses both to provide testimony regarding Weston's character for untruthfulness and to provide impeachment evidence for Weston's cross-examination.

Though Ford characterizes Kooistra's investigation as lacking, the record actually shows that Kooistra dedicated substantial time and resources to researching Weston's background. Kooistra met with a tribal prosecutor to obtain information about Weston. Kooistra also requested and obtained a court-qualified investigator, Mulloy, to assist with trial preparation. Shortly thereafter, Kooistra asked Ford to be ready to brief Mulloy with all he knew about Weston. Kooistra spent several hours both on the phone and in-person discussing Ford's case with Mulloy. Kooistra specifically directed Mulloy to interview the tribal court clerk, Kristi Bietz, and any family members or third parties with knowledge of the relationship between Weston and Ford. After a conversation with Ford's former attorney, Lori Sanford, Kooistra also directed Mulloy to interview Hoss.

Sanford described Weston as a partier who liked to drink and argue, but she directed Mulloy to the tribal court offices for actual records. As a result of his

interview with Bietz, Mulloy determined that he and Kooistra had all the available files on Weston. Bietz communicated to Mulloy that files concerning protection orders against Weston by Hoss and Dewald-Hoss "have been dismissed," "were put on hold for one year," and "were not reinstated." Interview Notes at 1–2, *United States v. Ford*, 4:15-cv-04152-KES (D.S.D. Oct. 1, 2015), ECF No. 5-4. Kooistra stated that he directed Mulloy to interview Hoss, but Mulloy provided him with no useful information concerning Hoss. Mulloy's report on Weston's files contained no mention of a protection order by Sunderland against Weston. Kooistra and Mulloy found no evidence of Sunderland's protection order against Weston before trial. Later investigation uncovered a protection order filed in Minnestota state court. Nevertheless, we cannot say that Kooistra unreasonably failed to discover this information.

Reasonable professional judgment is not infallible. Failure to discover a particular piece of marginally helpful information does not render legal representation constitutionally deficient. *See Strickland*, 466 U.S. at 690–91. Kooistra and Mulloy conducted a thorough investigation, and their imperfect investigation has not been shown to be ineffective representation. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

In total, Mulloy conducted 28 hours of investigative work in connection with Ford's case—falling just shy of spending his entire investigative budget. Kooistra averred that Ford was aware of the information Mulloy had obtained (and not obtained), and Ford never expressed that they had avenues "left unconsidered or unexplored." Aff. of Stacy Kooistra at 7, *United States v. Ford*, 4:15-cv-04152-KES (D.S.D. Dec. 21, 2015), ECF No. 16.

Kooistra and Mulloy interviewed a variety of individuals connected to Weston and Ford, but they ultimately relied on the files the tribal court provided. Kooistra

admitted he would have liked to have had more information about Weston to assist in Ford's defense. But we cannot say that he performed in an objectively unreasonable manner in relying primarily on the tribal court records.

Kooistra and Mulloy dedicated a significant amount of time and money to investigating Weston. Indeed, Ford himself essentially acknowledged this when he wrote to Kooistra after trial: "Want to take a moment here to say thank you. You've worked very hard on my case and I am very grateful. Thanks for getting the first charge acquitted and hopefully we will get the 2nd charge acquitted also. . . . You've gotten me this far and it's a lot farther than everyone expected." Letter from Ford to Kooistra at 1, *United States v. Ford*, 4:15-cv-04152-KES (D.S.D. Dec. 21, 2015), ECF No. 16-1.

We conclude that Kooistra's investigation of Weston demonstrated reasonable professional judgment and thus was not constitutionally deficient.

### 2. *Failure to Impeach*

Because Kooistra conducted a reasonable investigation, Ford must clear a high bar to successfully challenge the strategic litigation decisions derived from that investigation. Ford claims Kooistra rendered ineffective assistance by failing to effectively impeach Weston's credibility. Ford specifically argues Kooistra should have cross-examined Weston about allegations made by Weston's ex-husband, her ex-husband's wife, and an ex-boyfriend. He also implies Kooistra should have called these individuals as character witnesses against Weston. Ford further argues Kooistra should have called the tribal court clerk to testify about pending assault charges against Weston.

### a. *Failure to Sufficiently Cross-Examine*

"[T]he Eighth Circuit has found constitutionally deficient performance of trial counsel based on ineffective cross-examination where counsel allowed inadmissible

devastating evidence before the jury or when counsel failed to cross-examine a witness who made grossly inconsistent prior statements." *United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (internal quotation omitted). This is not such a case.

Kooistra cross-examined Weston extensively, but Ford argues Kooistra should have cross-examined Weston specifically about her relationship with Dewald-Hoss based on Dewald-Hoss's letter to the court in which she described Weston as a liar and a gossip. Dewald-Hoss's letter references a protection order against Weston and alleges Weston falsely accused Dewald-Hoss and her husband of kidnapping Weston's children. Ford contends Kooistra's failure to highlight the letter rendered representation ineffective. We disagree. Kooistra possessed the professional discretion to determine the strategic value of using the letter for impeachment. In his affidavit, Kooistra explained that because he found no record of a legal action involving Dewald-Hoss on file in the tribal court, he could not accurately evaluate the usefulness of raising the issue at trial. Mulloy's investigation of Dewald-Hoss's husband likewise yielded no useable information on the subject.

We cannot say Kooistra's decision not to rely on an unsworn letter from Weston's ex-husband's new wife for impeachment purposes was unreasonable. Because Kooistra thoroughly investigated Weston's relationship with Hoss and Dewald-Hoss, his "strategic choices . . . are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Moreover, because "[w]e generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel," *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001), we cannot say Kooistra acted unreasonably in declining to cross-examine Weston about the allegations in Dewald-Hoss's letter.

A similar logic applies to the alleged protection order by Sunderland against Weston. Mulloy's interview with Bietz, the tribal court clerk, yielded no record of an action involving Sunderland. Kooistra therefore could have reasonably concluded its

-11-

impeachment value was negligible. The order of protection that Sunderland obtained was actually a mutual restraining order, meaning the court restrained both Weston and Sunderland. Evidence of such an order would not have meaningfully assisted Kooistra in depicting Weston as dishonest.

Lastly, by focusing on Kooistra's alleged missteps on cross-examination, Ford overly discounts Kooistra's considerable success. During his cross-examination of Weston, Kooistra highlighted multiple inconsistencies in her testimony about the alleged sexual assault and kidnapping. For example, Kooistra highlighted inconsistencies in Weston's and Sherman's testimony about the timing of the events in question. He also highlighted inconsistencies in Weston's testimony about when and how she received the bruises on her arms and legs; her and Ford's living arrangements; the nature of Ford's sexual advances; and the amount of alcohol consumed during the evening with Ford, Sherman, and Red Earth. Kooistra's cross-examination elicited testimony that significantly undermined Weston's credibility. Ultimately, taking into account all the testimony, the jury acquitted Ford of the sexual assault charges.

Accordingly, we reject Ford's claim that Kooistra's cross-examination of Weston amounted to ineffective assistance of counsel.

### b. *Failure to Call Witnesses*

"The decision not to call a witness is a virtually unchallengeable decision of trial strategy." *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (internal quotations omitted). Nevertheless, Ford argues Kooistra was ineffective in not calling Bietz, the tribal court clerk, to testify to the tribal charges against Weston for assaulting Ford. Ford also argues Kooistra was ineffective "because, although [Weston] had a reputation in the community for being untruthful and specific witnesses were identified who could have impeached her credibility, not a single impeachment witness was called to testify." Appellant's Br. at 23.

Ford argues that evidence of the tribal charges against Weston would have demonstrated that Weston had a motive to fabricate retaliatory charges against him. Kooistra in fact elicited some information about the charges and Ford's scheduled testimony against Weston during his direct examination of Ford. Kooistra acted within his discretion in attempting to introduce evidence of Ford's charges against Weston through Ford's direct testimony rather than by calling Bietz. We therefore cannot say Kooistra was unreasonable in deciding not to call Bietz as a witness. Kooistra's strategy for eliciting testimony about Ford's assault allegations against Weston may not have been ideal. However, our law does not call for an ideal defense: it calls for a reasonable defense. *See Staples*, 410 F.3d at 488.

Ford further suggests that, absent calling Bietz, Kooistra should have pushed him harder for details about Weston's assault charges and his scheduled testimony against her; however, Kooistra may reasonably have determined that pushing Ford—his own witness—too hard on the stand would have undermined his own case. Ultimately, the jury nonetheless learned of the charges during Kooistra's direct examination of Ford, as well as during the government's cross-examination of Ford.

Kooistra's decision not to call Dewald-Hoss, Hoss, or Sunderland as potential character witnesses also was within the discretion of counsel, and his decision not to do so was not ineffective assistance. We afford counsel's decision in such matters some deference because "there is considerable risk inherent in calling any witness[;] if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences against the party who called him or her." *Id.* at 489.

Calling Dewald-Hoss and Hoss as witnesses clearly could have presented such a risk. A jury may not have considered Weston's ex-husband and her ex-husband's new wife—veterans of a contentious custody battle involving Weston's children—as reliable witnesses. Even if viewed as a failure to call two potentially helpful

-13-

witnesses, such a failure does not necessarily amount to ineffective representation. *See English v. United States*, 998 F.2d 609, 613 (8th Cir. 1993).

Similarly, even if Kooistra had identified Sunderland as a potential witness before trial, we cannot say declining to call him as a witness would have amounted to ineffective assistance. Sunderland and Weston's mutual protection order indicates that both parties acted aggressively toward the other. "[B]ecause [Sunderland's] testimony was potentially damaging and would not have exonerated [Ford], counsel's decision not to call [him] to testify at [Ford's] trial [would] not [have been] objectively unreasonable." *Orr*, 636 F.3d at 956 (quoting *United States v. Watkins*, 486 F.3d 458, 465 (8th Cir. 2007), *vacated on other grounds*, 552 U.S. 1091 (2008)).

Ford's criticism of Kooistra's witness selection likewise unreasonably discounts Kooistra's considerable success at trial. Kooistra called two impeaching witnesses, Drs. Kutscher and Dimitrievich, who offered medical testimony undercutting Weston's version of events. Dr. Kutscher's testimony mitigated Weston's claim that drugs and alcohol incapacitated her during her sexual encounter with Ford, and Dr. Dimitrievich's testimony undermined Weston's claim that Ford had anally penetrated her.

Kooistra explains in his affidavit that "a strategically effective way to attack Ms. Weston's credibility would be to engage science, as such would disprove Ms. Weston's version of the timeline and series of events." Kooistra Aff. at 2. Kooistra's "intent and hope at that stage of trial was that, considering the entirety of the testimony, Ms. Weston's credibility would have been sufficiently impeached to ensure Defendant's testimony and version of events were considered the most reliable." *Id.* at 7 n. 2.

Kooistra did not act unreasonably in concluding that the best way to discredit an alleged sexual assault victim was through scientific evidence and expert testimony

rather than through attempted character demolition. Kooistra provided reasonable representation.

B. *Failure to Hold an Evidentiary Hearing*

Ford maintains the district court erred in declining to hold an evidentiary hearing on his ineffective-assistance claim.

"We review for abuse of discretion the district court's denial of [Ford's] § 2255 motion without an evidentiary hearing . . . ." *Adams*, 869 F.3d at 634. "A § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005) (cleaned up).

Because the record sufficiently demonstrates that Ford's counsel was not ineffective, the district court did not err in declining to hold an evidentiary hearing.

III. *Conclusion*

Accordingly, we affirm the district court's decision.

_____